## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **Monteria Najuda Robinson**, as the natural parent of Jamarion Rashad Robinson , and the Representative of the Estate of Jamarion Rashad Robinson,<br><br>    Plaintiffs,<br><br>vs.<br><br>**William Sauls,** Atlanta Police Officer, **Steve Schreckengost,** Atlanta Police Detective; **Steve O'Hare,** Atlanta Police Detective; **Daniel Doyle,** Fulton County Detective;  **Kristopher  Hutchens,** Clayton County Police Officer; **Joshua Mauney,** Fayette County Sheriff's Officer; **Eric Heinze,** United States Marshals Service (USMS) Inspector; Agent "**TEZ**"; **City of Atlanta, Fulton County, Clayton County,**<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 1:18-CV-0131-TCB<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

_____

## THIRD AMENDED COMPLAINT
_____

Plaintiff, Monteria Najuda Robinson, as the natural parent of Jamarion Rashad Robinson and the Executor of the Estate of Jamarion Rashad Robinson, by and through her attorneys, David J. Utter, The Claiborne Firm, P.C., Andrew M. Stroth and Carlton Odim, Action Injury Law Group LLC, files this Complaint against Defendants William Sauls, Steve Schreckengost, Steve O'Hare, Daniel Doyle, Kristopher Hutchens, Joshua Mauney, Eric Heinze, Agent "TEZ," (collectively "Defendant-Officers"), and City of Atlanta, Fulton County, and Clayton County

(collectively "Defendant-Municipalities"), based on the following allegations:

## INTRODUCTION

1.

This is a civil rights action. On August 5, 2016, at approximately 1:30 p.m. Jamarion Robinson, a 26-year-old African American male and a diagnosed schizophrenic, lost his life. One or more of the Defendant-Officers shot him without legal justification.

2.

At the time of the shooting, Jamarion Robinson presented no immediate threat of death or serious bodily injury to the Defendant-Officers or anyone else.

## JURISDICTION AND VENUE

3.

The Jurisdiction of the court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983 et seq; the Judicial Code, §§ 1331 and 1343(a); and the Constitution of the United States. As to the state claims, Plaintiffs invokes 42 U.S.C. § 1367.

4.

Venue is proper in this District under 28 U.S.C. § 1391(b). The parties reside, or, at the time the events took place, resided in this judicial district, and the events giving rise to the plaintiff's claims also occurred in this judicial district.

## PARTIES

### **Plaintiff**

5.

Jamarion Robinson was a 26-year-old man and citizen of the United States residing in the

state of Georgia.

6.

Plaintiff Monteria Najuda Robinson is Jamarion Robinson's mother and natural parent.

7.

The Estate of Jamarion Robinson is Mr. Robinson's valid legal estate. Plaintiff Monteria Robinson was appointed executor of the estate by the Probate Court of Gwinnett County, Georgia on December 28, 2017.

**Defendants**

8.

William Sauls was, at all times relevant to the allegations made in this complaint, a duly appointed police officer employed by the City of Atlanta, acting within the scope of his employment with the City of Atlanta and under the policies, customs and practices of the City of Atlanta.

Additionally, William Sauls was, at all times relevant to the allegations made in this complaint, assigned as a Task Force Officer with the United States Marshal's Service (USMS), Southeast Regional Fugitive Task Force (SERFTF), acting within the scope of his employment with the United States and under color federal law.

He is sued in his individual capacity.

9.

Steve Schreckengost was, at all times relevant to the allegations made in this complaint, a duly appointed police officer and detective employed by the City of Atlanta, acting within the scope of his employment with the City of Atlanta and under the policies, customs and practices

of the City of Atlanta.

Additionally, Steve Schreckengost was, at all times relevant to the allegations made in this complaint, assigned as a Task Force Officer with the United States Marshal's Service (USMS), Southeast Regional Fugitive Task Force (SERFTF), acting within the scope of his employment with the United States and under color federal law.

He is sued in his individual capacity.

10.

Steve O'Hare was, at all times relevant to the allegations made in this complaint, a duly appointed police officer and detective employed by the City of Atlanta, acting within the scope of his employment with the City of Atlanta and under the policies, customs and practices of the City of Atlanta.

Additionally, Steve O'Hare was, at all times relevant to the allegations made in this complaint, assigned as a Task Force Officer with the United States Marshal's Service (USMS), Southeast Regional Fugitive Task Force (SERFTF), acting within the scope of his employment with the United States and under color federal law.

He is sued in his individual capacity.

11.

Daniel Doyle was, at all times relevant to the allegations made in this complaint, a duly appointed police officer employed by Fulton County, Georgia, acting within the scope of his employment with Fulton County, and under the policies, customs and practices of Fulton County.

Additionally, Daniel Doyle was, at all times relevant to the allegations made in this

complaint, assigned as a Task Force Officer with the United States Marshals Service (USMS), Southeast Regional Fugitive Task Force (SERFTF), acting within the scope of his employment with the United States and under color federal law.

He is sued in his individual capacity.

12.

Officer Kristopher Hutchens was, at all times relevant to the allegations made in this complaint, a duly appointed police officer employed by Clayton County, Georgia, acting within the scope of his employment with Clayton County, and under the policies, customs and practices of Clayton County.

Additionally, Kristopher Hutchens was, at all times relevant to the allegations made in this complaint, assigned as a Task Force Officer with the United States Marshal's Service (USMS), Southeast Regional Fugitive Task Force (SERFTF), acting within the scope of his employment with the United States and under color federal law.

He is sued in his individual capacity.

13.

Joshua Mauney was, at all times relevant to the allegations made in this complaint, a duly appointed police officer employed by the Fayette County Sheriff, acting within the scope of his employment with the Fayette County Sheriff, and under the policies, customs and practices of the Fayette County Sheriff.

Additionally, Joshua Mauney was, at all times relevant to the allegations made in this complaint, assigned as a Task Force Officer with the United States Marshal's Service (USMS), Southeast Regional Fugitive Task Force (SERFTF), acting within the scope of his employment

with the United States and under color federal law.

He is sued in his individual capacity.

14.

Eric Heinze was, at all times relevant to the allegations made in this complaint, a law enforcement officer employed as an Inspector with the United States Marshals Service (a federal law enforcement agency within the United States Department of Justice), acting with the scope of his employment with the Marshals Service and under the color of federal law. He is sued in his individual capacity.

15.

Agent "Tez" was, at all times relevant to the allegations made in this complaint, a law enforcement officer employed with an unknown Georgia state, county, or municipal law enforcement agency, acting with the scope of his employment with that law enforcement agency, and under the policies, customs and practices of that government entity.

Additionally, or alternatively, Agent "Tez" was, at all times relevant to the allegations made in this complaint, assigned as a Task Force Officer with the United States Marshal's Service (USMS), Southeast Regional Fugitive Task Force (SERFTF), acting within the scope of his employment with the United States and under color federal law.

He is sued in his individual capacity.

16.

Unidentified East Point Police Officers were, at all times relevant to the allegations made in this complaint, law enforcement officers employed with the East Point Police Department, acting with the scope of their employment for the City of East Point, Georgia, and under the

policies, customs and practices of the City of East Point.

17.

Defendant City of Atlanta, a municipality duly incorporated under the laws of the State of Georgia, is the employer and principal of Defendant Officers Sauls, Schreckengost, O'Hare and possibly Agent Tez.  The City is responsible for the policies, practices and customs related to the maintenance and operation of its police force.

18.

Defendant Fulton County, a county duly established under the laws of the State of Georgia, is the employer and principal of Defendant Officer Doyle and possibly agent Tez.  The County is responsible for the policies, practices and customs related to the maintenance and operation of its police force.

19.

Defendant Clayton County, a county duly established under the laws of the State of Georgia, is the employer and principal of Defendant Officer Hutchens and possibly agent Tez. The County is responsible for the policies, practices and customs related to the maintenance and operation of its police force.

20.

City of East Point, a municipality duly incorporated under the laws of the State of Georgia, is the employer and principal of the unknown East Point police officers described in this complaint and possibly agent Tez.  The City is responsible for the policies, practices and customs related to the maintenance and operation of its police force.

## FACTS

### 21.

Prior to August 5, 2016, and at all times relevant to the allegations contained in this complaint, the City of Atlanta and its police department participated in a joint venture [hereinafter referred to as the "Task Force"] with Fulton County, Georgia and its Police Department, with Clayton County, Georgia and its Police Department and Fire Department, with the Fayette County Sheriff's Office of Georgia, with East Point, Georgia and its Police Department, and with the United States Marshall's Service (USMS).

### 22.

According the USMS, "The SERFTF currently has Memoranda of Understanding (MOUs) with more than 20 federal, state, or local law enforcement agencies and continues to recruit other agencies to participate in the task force.  The SERFTF is becoming well recognized at [sic] the 'one-stop shop' for fugitive investigations in the state of Georgia."

### 23.

After the formation of the Task Force and in the weeks prior to August 5, 2016, defendant Steve O'Hare learned that Jamarion Robinson suffered from mental illness.

### 24.

On August 5, 2016, at approximately 12:30, seven or more members of the Task Force, including the Defendant-Officers, met at a church near Washington Road and Interstate 285 in Atlanta for the purpose of receiving information about serving an arrest warrant on decedent Jamarion Robinson at 3129 Candlewood Drive in Atlanta. Among other things, Steve O'Hare "relayed…ROBINSON'S mental health history" to the defendant officers in attendance.

25.

Approximately an hour after the meeting in the church the Defendant-Officers and other officer-members of the Task Force moved from the church near Washington Road and Interstate 285 to positions around and in front of 3129 Candlewood Drive.

26.

One or more of the Defendant-Officers and other officer-members of the Task Force pounded loudly on the front door of 3129 Candlewood Drive multiple times.

27.

Then one or more Defendant-Officers and other officer-members of the Task Force broke down the front door and, without cause or provocation by Jamarion Robinson, began "spraying" bullets around the interior of 3129 Candlewood Drive with one or more H&K 9 mm submachine guns, one or more H&K .40 mm submachine guns, and one or more Glock .40 pistols.

28.

When one or more of the Defendant-Officers began "spraying" bullets around the interior of 3129 Candlewood Drive, they did not know how many people were in the building.

29.

Fifty-nine bullets or more from the sub-machine guns and Glocks of the Defendant-Officers entered the body of Jamarion Robinson, killing him.

30.

After killing Jamarion Robinson, one or more of the Defendant-Officers ascended a single flight of stairs to a second-floor landing, where the bullet-riddled corpse of Jamarion Robinson was lying.

31.

With the intention of covering-up their actions by manipulating the evidence on the scene and with the intention making it more difficult if not impossible to accurately reconstruct the shooting-event, the Defendant-Officers and other officer-members of the Task Force:

    a.    Set off a flash bang grenade after lethally shooting Jamarion Robinson;

    b.    Stood over Jamarion Robinson corpse and mutilated it by firing into it two 9-millimeter bullets;

    c.    Handcuffed the corpse knowing that it was lifeless and without the power of animation to react to them;

    d.    Put an oxygen rebreathing mask over the corpse knowing that it was lifeless and without the power of respiration;

    e.    Dragged the corpse from the second-floor landing down a flight of stairs to the first floor, with the purpose of attempting to destroy the evidentiary connection:

        (i) between the bullet entry-and-exit wounds on the corpse and the surrounding walls, floor and ceiling;

        (ii) between the corpse and the blood- and flesh-spatter patterns on the surrounding walls, floor and ceiling; and

        (iii) between the corpse and its actual position when found by the defendant officers; and

    f.    Otherwise tampered with the evidence on the scene with the intention of destroying the evidentiary value.

32.

The Defendant-Officers had various less lethal uses of force as well as various devices, equipment and technology designed to aid in the detection and apprehension of "fugitives" and arrestees, including, but not limited to, flash-bang grenades and a robot equipped with video camera and microphone.

33.

The Defendant-Officers failed to utilize any of these less lethal uses of force or devices, equipment or technology to locate and arrest Jamarion Robinson prior to using deadly force on Jamarion Robinson by shooting him with their firearms, including semi-automatic and fully automatic, high capacity firearms.

34.

Despite having ample time and information regarding Jamarion Robinson's location in a multi-unit building, his history of mental illness, and the possibility that Jamarion would be armed, the Defendant-Officers did not develop a plan to locate and arrest Jamarion Robinson in the residence using less than lethal force.

35.

The Defendant-Officers did not develop a plan or utilize any strategies or techniques with the goal of preserving life while executing the arrest warrant for Jamarion Robinson.

36.

The Defendant-Officers' exclusive plan and method to apprehend Jamarion Robinson was to use deadly force by shooting him.

37.

The Defendant-Officers' use of semi-automatic and/or fully automatic, high capacity firearms did not allow for anything other than lethal force resulting in certain death.

38.

Each and every Defendant-Officer conspired with each other in the planned use of deadly force by their fellow Defendant-Officers by failing to recommend any plan, strategy, technique,

device or equipment involving less than lethal force and/or by failing to recommend any plan, strategy, technique, device or equipment to arrest Jamarion Robinson with the goal of preserving his life, and/or by failing to object to the plan and/or use of breaking into the residence armed with semi-automatic and/or fully automatic, high capacity firearms that solely involved the use of lethal force resulting in certain death.

39.

At all times material to the allegations contained in this complaint, the Defendant-Officers:

   a.   Were not properly trained to execute arrest warrants with the goal of preserving life;

   b.   Were not properly trained to execute arrest warrants using any plan, strategy, technique, device or equipment involving less than lethal force;

   c.   Were encouraged by their lack of training to use excessive and deadly force against Jamarion Robinson; and/or

   d.   Disregarded any training as a result of their assignment to the USMS SERFTF and the lack of adequate oversight and supervision by their local law enforcement agency-employer, i.e. Defendant-Municipalities, and lack of adequate oversight, training and supervision by the USMS.

40.

At all times material to the allegations contained in this complaint, the Defendant-Officers:

   a.   Were not properly trained to execute arrest warrants on people with psychiatric conditions;

   b.   Failed to investigate the mental health status of Jamarion Robinson before attempting to execute the arrest warrant, knowing that he was a diagnosed schizophrenic;

   c.   Were encouraged by their lack of training and their failure to investigate

the mental health status of Jamarion Robinson to use excessive and unreasonable force against Jamarion Robinson;

d.   Were not properly trained with regard to forcing their way into a structure where a civilian with a psychiatric condition is present, using flash bang grenades in a structure where a person with a psychiatric condition is present, and/or pointing and shooting firearms at a person with a psychiatric condition.

41.

The Defendant-Municipalities, by virtue of and as a result of assigning and/or allowing officer-employees, including the Defendant-Officers, to be recruited to the USMS SERFTF had certain policies, customs and/or practices and/or failed to maintain policies, customs and/or practices that resulted in the unreasonable seizure, excessive force and wrongful death of Jamarion Robinson. These policies, customs and/or practices (and/or failure to maintain same) include, but are not limited to, the following:

a.   Failure to train, instruct, regulate, and supervise officers regarding execution of multi-jurisdictional law enforcement operations;

b.   Failure to train, instruct, regulate, and supervise officers assigned to the USMS SERFTF and/or specific task forces

c.   Failure to train, instruct, regulate, and supervise officers regarding best practices for executing arrest warrants on people with psychiatric conditions;

d.   Failure to properly hire, train, supervise, discipline, transfer, monitor, counsel and/or otherwise control police officers who commit acts of excessive force, including unjustified shootings;

e.   Failure to properly hire, train, supervise, monitor, and support police officers in the mental health awareness and crisis intervention;

f.   Failure to properly hire, train, supervise, monitor and support police officers in the de-escalation techniques and procedures;

g.   Failure to train, instruct, regulate, and supervise officers regarding best practices

for use of force on people with psychiatric conditions;

h. Failure to train, instruct, regulate, and supervise officers to execute arrest warrants with the goal of preserving life;

i. Failure to train, instruct, regulate, and supervise officers to execute arrest warrants using a plan, strategy, technique, device or equipment involving less than lethal force;

j. Failure to investigate and or discipline officers assigned to the USMS SERFTF and/or specific task forces who use excessive force or otherwise violate Defendant-Municipalities' orders or policies.

k. Failure to ensure that officers assigned to the USMS SERFTF and/or specific task forces follow the Defendant-Municipalities' orders, policies, or best practices.

l. Failure to ensure that officers assigned to the USMS SERFTF and/or specific task forces have adequate training and supervision from the USMS to prevent the use of excessive force, including the use of excessive deadly force.

m. Failure to ensure that officers assigned to the USMS SERFTF and/or specific task forces have adequate training and supervision from the Defendant-Municipalities to prevent the use of excessive force, including the use of excessive deadly force in the context of SERFTF arrest warrant execution.

42.

Essentially, the Defendant-Municipalities fail to train, supervise and/or assume any responsibility for officer-employees, including the Defendant-Officers, when they are assigned to the USMS SERFTF or other federal or multi-jurisdictional law enforcement task force. This results in the officer-employees, including the Defendant-Officers, having a sense of lawlessness and/or disregard of individual citizens' rights, safety and bodily integrity when performing law enforcement tasks and duties, including executing arrest warrants and using force, including deadly force, while on the task force.

43.

At the same time, the USMS fails to assume responsibility for the individual officers,

(including the Defendant-Officers) from local law enforcement agencies (including the Defendant-Municipalities) assigned to the USMS SERFTF (and other task forces), and fails to train, supervise, or regulate them, further perpetuating the lack of accountability and sense of lawlessness cloaking these task forces.

44.

The actions of the Defendant-Officers and their named and unnamed co-conspirators, as alleged in this complaint, were done jointly, in concert, and with shared intent and, therefore constitute a conspiracy.

### Count 1
### Bivens Claim v. Defendant-Officers

45.

As alleged above, some or all of the Defendant-Officers shot Jamarion Robinson 59 times while executing an arrest warrant with the Task Force as part of the USMS SERFTF program.

46.

This use of force, in shooting their firearms at Jamarion Robinson, was excessive and unreasonable in that they the officers were not threatened with imminent death or serious bodily injury when they shot and killed Jamarion Robinson.

47.

The actions of some or all of the Defendant-Officers, as alleged in this complaint, in shooting and killing Jamarion Robinson, violated Jamarion Robinson's rights under the Fourth Amendment to the United States Constitution to be secure in his person against unreasonable seizure.

48.

The actions of the Defendant-Officers as alleged in this Count of the complaint were the direct and proximate cause of the constitutional violations set forth above and of the injuries to Jamarion Robinson and his Estate.

## Count 2
## Conspiracy Claim v. Defendant-Officers

49.

Plaintiffs repeat and reallege the preceding paragraphs of this complaint as if they were fully set out in this Count.

50.

The Defendant-Officers, as alleged in this complaint, reached an understanding, engaged and continued to engage in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to unreasonably stop, seize, shoot and injure Jamarion Robinson, resulting in his death, to destroy and fabricate evidence, to complete false, inaccurate, and misleading reports, and to make false statements to superior officers in order to conceal their wrongdoing.

Specifically, the Defendant-Officers met beforehand to plan the execution of the arrest warrant for Jamarion Robinson, and then proceeded with their dangerous, haphazard and reckless plan to burst into the residence, fire their semi-automatic weapons indiscriminately and profusely at the slightest hint of danger, and then claim that such force was necessitated because the arrestee possessed a gun to justify their unlawful and unjustified actions.

51.

In furtherance of this conspiracy, the Defendant-Officers committed the overt acts as

alleged in this complaint and thus violated Plaintiff's Fourth Amendment rights and caused wrongfully caused his death.

## Count 3
## Battery Claim

52.

The Defendant-Officers, as alleged in this complaint knowingly and without legal justification caused bodily harm to Jamarion Robinson when they shot and injured him, thereby constituting battery under Georgia law.

Plaintiff filed a notice of claim with the United States Marshall's Office in August, 2018.

Six months have passed since filing notice of the claim and the claim has not been responded to or otherwise acted upon.

Thus, Plaintiff has exhausted her administrative remedies and is entitled to bring suit under the Federal Tort Claims Act.

## Count 4
## Wrongful Death Claim

53.

The Defendant-Officers, as alleged in this complaint knowingly and without legal justification caused bodily harm to Jamarion Robinson when they shot and injured him.

As a direct and proximate result of the Defendants' criminal, intentional, and negligent acts, Jamarion Robinson died by homicide.

54.

Mr. Robinson's death was a wrongful death within the meaning of the Georgia Wrongful Death Act, O.C.G.A. §§ 51-4-1, *et. seq.*

55.

Section 51-4-4 provides a right of action for the wrongful death of a child killed by homicide.

56.

Under O.C.G.A. §§ 19-7-1(c)(2)(A), Plaintiff Monteria Robinson is the parent entitled to prosecute this right of action and entitled to the full value of the life of Jamarion Robinson. Plaintiff filed a notice of claim with the United States Marshall's Office in August, 2018.

Six months have passed since filing notice of the claim and the claim has not been responded to or otherwise acted upon.

Thus, Plaintiff has exhausted her administrative remedies and is entitled to bring suit under the Federal Tort Claims Act.

**Count 5**
**42  U.S.C. § 1983 Claim for Excessive Force/Fourth Amendment Claim**

57.

The Defendant-Municipalities had certain policies, practices and/or customs as alleged in the above paragraphs of this complaint, that separately and together, were the proximate cause of the injury and death of Jamarion Robinson. and of the injury to his Estate.

The Defendant-Municipalities had a policy, practice and/or custom of assigning officers to task forces through the USMS SERFTF while at the same time failing to train, supervise or oversee the officers assigned to these task forces in the proper use of force, service of arrest warrants, fugitive apprehension, arresting or otherwise interacting with mentally ill subjects, less than lethal uses of force, and preservation of life.

The Defendant-Municipalities had a policy, practice and/or custom of failing to ensure that the USMS provided any training, supervision and/or oversight of the employee-officers assigned to these task forces regarding the proper use of force, service of arrest warrants, fugitive apprehension, arresting or otherwise interacting with mentally ill subjects, less than lethal uses of force, and preservation of life.

The officers employed by the Defendant-Municipalities signed deputization forms when assigned to a task force with the USMS that specifically cloaked the officers with federal authority yet stated that the officers remained employees of the Defendant-Municipalities.

This arrangement constituted a policy, custom and/or practice by which they Defendant-Municipalities were still responsible for the officers' actions, yet the Defendant-Municipalities were not involved in any training or oversight of the task force or the officers' actions while working on the task force.

This arrangement also constituted a policy, custom and/or practice by which they Defendant-Municipalities were still responsible for the officers' actions, yet the Defendant-Municipalities were not involved in any review of the officers' use of force or other actions, after the fact, such that the officers would never be subject to any scrutiny, discipline or investigation for the use of excessive force, including deadly force, or other police misconduct.

It was known, or was so obvious that it should have been known, to the Defendant-Municipalities that officer-employees assigned to task forces for the purpose of serving fugitive arrest warrants through the USMS SERFTF program, that the officers would be encountering situations wherein the use of force, including deadly force may be used.

It was known, or was so obvious that it should have been known, to the Defendant-Municipalities that officer-employees assigned to task forces for the purpose of serving fugitive arrest warrants through the USMS SERFTF program, that the officers would be equipped with semi-automatic weapons, flash bang grenades, robots, and other equipment that required training and supervision to ensure such items were used in a manner that does not constitute excessive force, that seeks to preserve life, and that utilizes less than lethal force in order to not violate people's Fourth Amendment rights and to ensure people's safety.

It was known, or was so obvious that it should have been known, to the Defendant-Municipalities that officer-employees assigned to task forces for the purpose of serving fugitive arrest warrants through the USMS SERFTF program, must be supervised, reviewed, investigated and potentially disciplined if they use force, including deadly force, in a manner that is excessive and jeopardizes individuals' safety and/or Fourth Amendment rights.

Thus, the Defendant-Municipalities were deliberately indifferent to the safety and constitutional rights of individuals subject to arrest and use of force by officers assigned to the USMS SERFTF program because the Defendant-Municipalities failed to train, supervise, review, investigate or discipline the officers assigned to the task force as described above. Any Defendant-Municipality knows that police officers need training and supervision in the use of force and service of warrants.

Furthermore, there had been other, prior incidents involving USMS task forces using deadly force on individuals in the context of serving arrest warrants. Such force was alleged to be unjustified and excessive. Thus, the Defendant-Municipalities had notice that their arrangement with the USMS and lack of training and oversight of the officers they assigned to

federal task forces was resulting in unjustified, excessive deadly force. The Defendant-Municipalities continued with their policy and practice of failing to train and supervise officers assigned to USMS task forces.

58.

The Defendant-Municipalities' policies, practices and/or customs (i.e. the lack of training, oversight and supervision) were the proximate cause of the injury and death of Jamarion Robinson and of the injury to his Estate.

59.

The Defendant-Municipalities' lack of accountability for officers' actions while assigned to the USMS SERFTF described in this Complaint caused the officers' conduct that resulted in the shooting and death of Jamarion Robinson.

60.

The interrelated policies, practices and customs, or lack thereof, as alleged in this complaint, individually and together, were maintained and implemented with deliberate indifference, and encouraged the individual police officers to commit the acts alleged in this complaint against Jamarion Robinson; they, therefore, are the moving forces behind, and the direct and proximate causes of, the injuries to Jamarion Robinson and his Estate.

61.

Among other things, the policies, practices and customs, or lack thereof, alleged in this complaint encouraged the extrajudicial shooting of civilians, other police misconduct, the fabrication of evidence, the destruction and contamination of evidence, the intimidation of witnesses, and the making of false, incorrect and misleading statements and reports. These

policies, practices and customs, therefore, are the moving forces behind, and the direct and proximate causes of, the unconstitutional acts committed by the individual Defendant Officers in this case and the injuries to Jamarion Robinson and his Estate.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs request that this Court award the Plaintiff:

1.      Substantial actual or compensatory damages for the violation of the constitutional rights and state law claims alleged in this complaint;

2.      Punitive damages;

3.      Attorney's fees and costs; and

4.      All other monetary relief that the court deems appropriate, including pre- and post-judgment interest.

Respectfully submitted, this 3rd day of April, 2019.


/s/: *David J. Utter*
DAVID J. UTTER
Georgia Bar Number: 723144
THE CLAIBORNE FIRM, P.C.
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
david@claibornefirm.com

ANDREW M. STORTH
Action Injury Law Group, LLC
191 North Wacker Drive
Suite 2300
Chicago, IL  60606
(844) 878-4529 Telephone
astroth@actioninjurylawgroup.com
*(Pro Hac Vice to be Filed)*

22

CARLTON ODIM
Odim Law Offices
225 West Washington Street
Suite 2200
Chicago, IL  60606
(312) 578-9390 Telephone
carlton@odimlawoffices.com
*(Pro Hac Vice to be Filed)*

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2019 a copy of the foregoing *Second Amended Complaint* was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent by operation of the court's electronic filing system to all counsel of record.

/s/ *David Utter*
David Utter