IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MONTERIA NAJUDA
ROBINSON, as the natural parent
of Jamarion Rashad Robinson and
the representative of the estate of
Jamarion Rashad Robinson,

     Plaintiff,

v.

WILLIAM SAULS; STEVE
SCHRECKENGOST; STEVE
O'HARE; KRISTOPHER
HUTCHENS; JOSHUA MAUNEY;
ERIC HEINZE; SANTEZ
KINDRED; and PAMELA J.
DOYLE, administrator of the
estate of Daniel Doyle,

     Defendants.

CIVIL ACTION FILE

NO. 1:18-cv-131-TCB

## **O R D E R**

This case comes before the Court on Defendants' motions [244,

245, 246, 247] to exclude Dr. Neal Small, Dr. Michael Baden, Roy

Bedard, and Dr. Kendall Von Crowns[1] as Plaintiff Monteria Najuda

Robinson's expert witnesses, and Defendants' motions [248, 249] for

summary judgment.

# I.   Background

## A.   Attempted Arrest of Jamarion Robinson

On August 5, 2016, members of the Southeast Regional Fugitive

Task Force ("SERFTF"), coordinated by the United States Marshal

Service, gathered to serve arrest warrants on Jamarion Robinson, a

twenty-six-year-old African-American male diagnosed with

schizophrenia (hereinafter "Robinson").

Robinson was the subject of two active felony arrest warrants, one

for attempted arson of his mother's home while she was inside asleep,

and one for aggravated assault with a deadly weapon on two Atlanta

Police Department ("APD") officers. According to the APD report on the

latter incident, the APD officers were responding to a suspicious person

call at an apartment complex. When the officers attempted to detain

---

[1] Incorrectly named as Randall Crowns in Defendants' motion.

Robinson, he drew and pointed a firearm at the them and successfully fled the scene.

In preparation for serving the two arrest warrants, Task Force Officer ("TFO") O'Hare, the case agent, spoke with Ms. Robinson on the phone, and she informed O'Hare that her son had possible unmedicated mental health issues and had not been acting like himself.

On August 5, O'Hare located Robinson at the apartment of Robinson's ex-girlfriend, Dartyngala White. The SERFTF officers met in a nearby church parking lot in Atlanta to discuss execution of the warrants. During this meeting, O'Hare briefed the officers on Robinson's mental health issues, the crimes giving rise to Robinson's active arrest warrants, and the possibility that Robinson was armed.

TFO Mauney provided the tactical assignments for the warrant service operation. The plan was to conduct a standard knock-and-announce operation to give Robinson the opportunity to surrender, followed by a breach-and-hold if necessary, with the ultimate goal of gaining peaceful compliance while ensuring public safety.

Inspector Heinze was assigned to the first position: shield operator at the front of the entry team. TFO Hutchens was assigned to the second position, and TFO Doyle to the third. All members of the SERFTF team wore markings on their front and back identifying themselves as law enforcement officers. Heinze carried a ballistic shield labeled with clearly identifiable "Police" and "US Marshals" markings.

The SERFTF officers went to the apartment to serve the warrant. Though the officers knew that White had left the apartment, they did not know whether anyone other than Robinson was in the apartment.

The officers initially set a perimeter team around the side and back of the apartment. Members of the SERFTF team crossed the elevated walkway to get to the apartment entrance and positioned themselves outside the front door. Heinze was positioned to the right of the front door, and Hutchens was positioned to the left.

Hutchens then knocked on the door and stated, "police, come to the door," and other words to that effect. Several attempts to knock and announce police presence were made over the course of several minutes. The knocking was loud enough to be heard behind the apartment

building and by neighbors. There was no verbal response to the knock-and-announce, though an officer stationed behind the building saw someone look out of a second-floor bedroom window.

When no one came to the door, O'Hare gave the command to breach the door. The team knocked again and announced, "police, we are going to breach the door." There was no response. TFO Sauls breached the door with a ram and returned to his position in the tactical stack.

The officers maintained their position at the apartment doorway for at least one minute after the door was breached, pursuant to SERFTF standard practice. Heinze held the door open with his left foot, and other officers announced, "police, U.S. Marshals, come to the door" several times. The announcements were loud enough to be heard behind the apartment building and by neighbors.

From their positions to the right and left of the door, Heinze and Hutchens could observe the inside of the apartment. Doyle was positioned between Heinze and Hutchens in the doorway.

A partially enclosed stairwell was to the right of the front door. Heinze could not see the landing at the top of the stairs due to a wall that went most of the way down the stairwell, though he could hear movement upstairs. He continued to instruct Robinson to come out.

He then saw feet near the top of the stairs and repeatedly stated, "show me your hands," "come down the stairs slowly," and words to that effect. Robinson grunted a verbal acknowledgement, though Heinze could not understand what was said. Heinze could see Robinson's feet begin to move down the stairs one at a time in a slow, deliberate fashion.

After Robinson had taken several steps, Heinze could not see his face but could see that his body was slightly bent. Heinze again instructed Robinson to show his hands.

Heinze saw that Robinson had something cupped in both of his hands and immediately called out, "he's got something in his hands." Robinson appeared to make incremental movements to gain visibility of the officers. Doyle then called out, "he's got a gun," and at the same time, Heinze saw that Robinson had a silver and black handgun in both

6

of his hands, with his arms bent in front of him and the firearm pointed at Heinze. Heinze estimates that Robinson was less than ten feet away.

Believing Robinson to be a threat, Heinze discharged his firearm several times. Doyle also discharged his firearm. Robinson retreated up several stairs, but he remained partially in Heinze's view. Heinze and other members of the SERFTF ceased fire, remained in the doorway, and continued to verbally instruct Robinson to drop his weapon and come out.

Over the next several minutes, Robinson would intermittently return to view and point a firearm toward the officers before moving away. During the engagement, when Robinson would point his firearm at the officers, Heinze, Doyle, and Hutchens would respond to the threat with deadly force. Hutchens saw one or more shots strike Robinson.

At one point while Robinson was around the wall toward the top of the stairs, Heinze, Hutchens, and Doyle heard two muffled gunshots from Robinson's direction. The three officers also heard what sounded like Robinson racking the slide of his firearm. Mauney and Sauls, who

were positioned next to Heinze, heard shots fired from a location that sounded farther away than the SERFTF officers' location. Mauney also heard the racking of a firearm.

During the moments when Robinson did not pose an immediate threat, the officers repeatedly issued verbal warnings, instructing Robinson to show his hands, drop the weapon, and come out. The commands were loud enough to be heard behind the building. Robinson did not comply.

Throughout the exchange, the officers felt that they were in a vulnerable position due to their location in the doorway, limited visibility, elevated location on the platform outside the front door, and exposure to the windows above. They also believed themselves to be at a disadvantage because of Robinson's elevated position and ability to retreat from view.

At one point after the officers discharged their weapons, Robinson fell on the floor near the top of the stairs with his chest on the staircase landing and his legs positioned down the stairs. Heinze, Hutchens, and Doyle moved from the doorway inside the apartment towards the base

of the stairs to get a better view and tactical position. The officers observed Robinson moving, rolling back and forth, and breathing, and they instructed Robinson to put down the weapon and show his hands.

According to the officers, while Robinson was still on the floor, he rolled and began to lift the firearm and point it at the officers. Heinze, Hutchens, and Doyle discharged their firearms toward Robinson. His hands dropped, and the officers could see neither his hands nor the firearm. Heinze testifies that Robinson was still moving at this point, though he was not responding to commands. Hutchens testifies that there was no further movement from Robinson. In his statement to the Georgia Bureau of Investigation ("GBI"), Doyle said that Robinson raised his gun a second time while on the floor, and Doyle responded by discharging his weapon.[2]

Heinze and Hutchens affirm that no further shots were fired at Robinson once he became unresponsive. Doyle stated the same in his GBI interview.

_____

[2] TFO Doyle died from an unrelated condition before he could provide a sworn declaration.

To determine whether Robinson was incapacitated or whether he continued to pose a threat, Hutchens deployed a flashbang device. He threw the device over the stairs into the second-floor hallway on the other side of Robinson. The device detonated near the landing area. Robinson did not respond or otherwise react.

Because the officers still could not see Robinson's hands or firearm, Mauney deployed a reconnaissance video robot to the top of the stairs. The robot's transmitted video indicated that the firearm might not be in Robinson's hands. Next, Heinze and Doyle moved up a few stairs to peek quickly at the second floor, locate the firearm, and see if there was movement from Robinson.

Then, Heinze covered Sauls with the shield while the two officers moved up the stairs to retrieve Robinson. Sauls pulled Robinson down the stairs by his ankles, away from the firearm. Heinze called out when he could see that Robinson's hands were clear from the firearm. He saw the firearm at the top of the stairwell landing. As Sauls reached the bottom of the stairs, Hutchens helped pull Robinson into the living room. Hutchens handcuffed Robinson and turned him onto his back.

TFO Durand, the tactical medic, arrived to administer first aid. He cut off Robinson's t-shirt and placed him on supplemental oxygen. He began rendering aid within seconds and continued until fire department personnel arrived. Robinson was declared dead at the scene.

### B.    GBI Investigation

The SERFTF turned over control of the scene to the East Point Police Department, who asked the GBI to investigate the incident. During their crime scene investigation, the GBI recovered a HiPoint .380 pistol from the landing at the top of the stairs. The recovered HiPoint was covered in blood; there was blood on the handle, within the trigger guard, and on the part of the barrel covered by the slide. The blood was submitted for DNA testing, and it was matched exactly to Robinson. No fingerprints were found on the recovered HiPoint or its magazine.

The GBI recovered three spent .380 shell casings from the landing and stairs, which were determined to have been fired from the HiPoint. The GBI recovered two live .380 auto cartridges from the landing on the

second floor. The GBI also noted two defects in the stairwell wall that indicated that bullets had been fired at a downward trajectory toward the door of the apartment.

Two .380 bullets were found in the front bedroom on the second floor of the apartment, the bedroom above the front door that shared the wall with the stairwell. One bullet was determined to have been fired by the recovered HiPoint. The other bullet was too deformed for a precise match but was consistent with having been fired from the HiPoint. Special Agent Clint Thomas, the GBI's lead investigating agent on the case, concluded that shots were fired from at or near the stop of the stairwell down toward the front door.

A forensic examination of the HiPoint revealed the firearm to be operable despite having some damage to the muzzle and dustcover. A trigger test was not performed because the internal parts of the firearm had rusted. The rust is not visible in the photographs of the firearm taken at the scene, and the GBI firearms examiner believes it was caused by the latent fingerprint examination.

Gunshot residue was found on Robinson's t-shirt.

The Fulton County Medical Examiner identified seventy-six distinct lacerations on Robinson's body and recovered forty-two bullets from his body. Robinson received no wounds to his brain, spinal column, neck, or heart. No evidence of soot or stippling was found around any of the wounds.

Roughly one hundred bullets were fired during the course of the incident. Fourteen bullet or bullet fragments recovered from the scene were fired from a Glock .40 pistol, the weapon Heinze was carrying. Thirteen additional bullets or fragments were consistent with having been fired from a Glock pistol. Four recovered bullets were fired from an H&K MP5 9mm submachine gun, the weapon Hutchens was carrying and had set to semi-automatic fire. Thirty-four recovered bullets, bullet jackets, and bullet jacket fragments were fired from an H&K UMP .40 submachine gun, the weapon Doyle was carrying and had set to automatic fire.[3]

---

[3] An additional twenty-six bullets, bullet fragments, bullet jacket fragments, lead cores, and lead fragments could not be identified or were not suitable for comparison purposes.

No shell casings from a .40 caliber or 9mm weapon were found on the second floor, on the upstairs landing, at the top of the stairs, or any higher in the apartment than the third step from the bottom.

Two bystander videos were recovered that captured portions of the incident. One video was filmed by neighbor Larry Michaels on a mobile phone. In Michaels's video, about twenty-two seconds after the flashbang is deployed, a noise is heard that Defendants and the investigating GBI officers agree sounds like a burst of automatic gunfire. The entrance to the apartment is out of view of the camera when the noise is heard.

### C.   Ms. Robinson's Lawsuit

Based on these facts, Ms. Robinson brought this suit asserting several claims: (1) violation of the Fourth Amendment and conspiracy under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics* against the SERFTF officers; (2) conspiracy under *Bivens* against the SERFTF officers; (3) battery and wrongful death under state law against the SERFTF officers; and (4) excessive force under 42

U.S.C. § 1983 against the City of Atlanta, Clayton County, and Fulton County (collectively, the "Defendant-Municipalities").[4]

This Court granted [128] the Defendant-Municipalities' motions to dismiss. The case remains pending as to the Defendant-SERFTF officers in their individual capacities.

On August 27, 2020, the Defendants filed *Daubert* motions [244, 245, 246, 247] to exclude Ms. Robinson's expert witnesses. Defendants Heinze and Hutchens filed a motion [248] for summary judgment,[5] and Defendants Kindred, Mauney, O'Hare, Sauls, and Schreckengost filed a motion [249] for summary judgment. The motions are ripe for the Court's review.

## II.    Legal Standard

### A.    Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment

---

[4] Ms. Robinson has amended her complaint three times. The operative pleading is her third amended complaint [92].

[5] This motion has been adopted by Defendant Pamela J. Doyle, administrator of the estate of Daniel Doyle [302].

as a matter of law." FED. R. CIV. P. 56(a). There is a "genuine" dispute as to a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In making this determination, "a court may not weigh conflicting evidence or make credibility determinations of its own." *Id.* Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Id.*

"The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the nonmoving party would have the burden of proof at trial, there are two ways for the moving party to satisfy this initial burden. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437–38 (11th Cir. 1991). The first is to produce "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.* at 1438 (citing *Celotex Corp.*, 477 U.S. at 331). The second is to show that "there is an absence of evidence

to support the nonmoving party's case." *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324).

If the moving party satisfies its burden by either method, the burden shifts to the nonmoving party to show that a genuine issue remains for trial. *Id.* At this point, the nonmoving party must "'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995) (quoting *Celotex Corp.*, 477 U.S. at 324).

## B.   *Daubert*

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Although the rules provide the Court with only limited guidance, the United States Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), is instructive. "Unlike an ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Id.* at 592 (citation omitted). Trial courts therefore act as "gatekeepers" to ensure that a proposed expert's testimony is not only relevant, but reliable. *Id.* at 589. To that end, district courts are "charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007).

As a gatekeeper, the trial court should conduct a "rigorous three-part inquiry" to determine whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). Although there is inevitable overlap among the three prongs of this analysis, trial courts must be cautious not to conflate them, and the proponent of expert testimony bears the burden to show that *each* requirement is met. *Id.*

*Daubert* sets forth a list of factors to be considered regarding the reliability of a proposed expert's testimony. These factors include (1) whether the expert's theory can be and has been empirically tested; (2) whether the expert's theory has been subjected to peer review and publication; (3) the known or potential error rate of the expert's theory; and (4) whether the expert's theory is generally accepted in the scientific community. *Daubert*, 509 U.S. at 593–94.

These factors bear on the Court's inquiry, but do not compose a definitive checklist. *Id.* at 593. Not every factor "will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." *Frazier*, 387 F.3d

at 1262. Thus, the trial court has considerable leeway to determine whether proffered expert testimony is reliable. *Id.*

Finally, the district court must assess whether the expert testimony will assist the trier of fact. Put another way, the Court must ask whether the expert testimony "concerns matters that are beyond the understanding of the average lay person." *Id.* (citing *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985)).

## III. Discussion

### A. Motions for Summary Judgment

Defendants move for summary judgment based on qualified immunity. They argue that Ms. Robinson cannot overcome their qualified immunity by establishing a constitutional violation of a clearly established right.

In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 395–97 (1971), the Supreme Court held that injured plaintiffs may bring a cause of action against federal officers based on violations of their constitutional rights.

Ms. Robinson alleges *Bivens* claims for excessive force and conspiracy. However, government officials performing discretionary functions are sheltered from suit under the doctrine of qualified immunity on a *Bivens* claim when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citing *Procunier v. Navarette*, 434 U.S. 555, 565 (1978); abrogating *Wood v. Strickland*, 420 U.S. 308, 322 (1975)).

After the "public official . . . prove[s] that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred,'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)), "the burden shifts to the plaintiffs to show that qualified immunity is inappropriate," *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012) (citing *Lee*, 284 F.3d at 1194).[6]

---

[6] Ms. Robinson does not dispute that Defendants were acting within the scope of their discretionary authority when they encountered her son.

"Faced with a defense of qualified immunity, the Court must first determine whether [Ms. Robinson] has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Anderson v. United States*, 107 F. Supp. 2d 191, 196 (E.D.N.Y. 2000) (citing *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)); *see also Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011) (noting that "these two steps do not have to be analyzed sequentially; if the law was not clearly established, [a court] need not decide if the Defendants actually violated the Plaintiff's rights" (citing *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009))).

The Court will evaluate each *Bivens* claim individually in light of Defendants' assertion that they are entitled to qualified immunity.

### 1.   Excessive Force Claim Against Heinze, Hutchens, and Doyle

The Supreme Court has held that an excessive force claim arising in the context of an arrest "is most properly characterized as one invoking protections of the Fourth Amendment, which guarantees

citizens the right 'to be secure in their persons . . . against unreasonable

. . . seizures . . . .'" *Graham v. Connor*, 490 U.S. 386, 394 (1989)

(alterations in original) (quoting U.S. CONST. amend. IV). Accordingly,

claims that law enforcement officers have used excessive force should be

analyzed under the Fourth Amendment objective reasonableness

standard. *Id.*

First, the Court must decide whether the facts alleged show that

Defendants' conduct violated a Fourth Amendment right. *Lee*, 284 F.3d

at 1197. The Court next determines whether the right violated was

clearly established. *Id.*

The Fourth Amendment encompasses "the plain right to be free

from the use of excessive force in the course of an arrest." *Id.* (citing

*Graham*, 490 U.S. at 394–95). To determine whether the amount of

force used was proper, "a court must ask 'whether a reasonable officer

would believe that this level of force is necessary in the situation at

hand.'" *Id.* (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1186 (11th

Cir. 2001)). The reasonableness should be judged from the perspective

of a reasonable officer on the scene. *Id.*; *see also Graham*, 490 U.S. at

396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."); *Brown v. City of Huntsville*, 608 F.3d 724, 738 (11th Cir. 2010) ("A law enforcement officer receives qualified immunity for use of force during an arrest if an objectively reasonable officer in the same situations could have believed the use of force was not excessive." (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002); *Graham*, 490 U.S. at 396–97; *Lee*, 284 F.3d at 1197)).

"Determining whether the force . . . used is 'reasonable' . . . requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). To balance the reasonableness of an officer's force, courts should consider (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Thus, to establish a constitutional violation, Ms. Robinson must show that Defendants' use of force was unreasonable under the circumstances. After careful review, it is clear that Ms. Robinson has not carried this burden.

With respect to the severity of the crime at issue, Defendants encountered Robinson while serving active arrest warrants for two violent felonies: attempted arson of his mother's home while she was therein, and aggravated assault with a deadly weapon on two police officers. *See, e.g.*, *Taylor v. Freeman*, 447 F. App'x 78, 81 (11th Cir. 2011) (finding that the first *Graham* factor weighed in favor of reasonable use of deadly force where the officer was aware of the suspect's assault on his wife and other acts of family violence); *Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009) (finding the officer's use of force to be objectively reasonable where the plaintiff was suspected of armed robbery, a serious crime giving the officer reason to believe that the plaintiff was armed and dangerous). Moreover, by the time Defendants used deadly force, Robinson had pointed a firearm toward Defendants. *See Spencer v. City of Orlando*, 725 F. App'x 928,

932 (11th Cir. 2018) (finding that the first *Graham* factor weighed in favor of reasonableness where by the time the officers used deadly force, the suspect had committed aggravated assault with a deadly weapon on the officers).

It is also undisputed that Robinson actively evaded arrest by refusing to obey repeated commands to come to the door and surrender. He continued to resist and evade arrest when he refused to drop his firearm and instead pointed it and fired it toward Defendants. *Penley v. Eslinger*, 605 F.3d 843, 851 (11th Cir. 2010) (finding that the first and third *Graham* factors weighed in favor of objectively reasonable use of force where the suspect brought to school what reasonable officers believed was a real firearm, threatened the lives of others, and refused to comply with officers' commands to drop the weapon); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1168–69 (11th Cir. 2009) (finding that the suspect's refusal to comply with repeated commands to show his hands, drop a cell phone, and drop the weapon pointed at his own head together justified the officers' "escalation into deadly force").

Turning to the second *Graham* factor—whether Robinson posed an immediate threat—"[t]he government has a weighty interest in protecting members of the public and police officers from the threat of force." *Penley*, 605 F.3d at 851 (citing *Garczynski*, 573 F.3d at 1166). As the Eleventh Circuit has clarified, this factor can be reduced to as single question: "whether, given the circumstances, [the suspect] would have appeared to reasonable police officers to have been gravely dangerous." *Id.* (quoting *Pace v. Capobianco*, 283 F.3d 1275, 1281 (11th Cir. 2002)). Defendants contend that Robinson posed an immediate threat to their safety or the safety of the public at all times that they discharged their firearms.

Ms. Robinson responds that several issues of material fact exist as to whether and when Robinson posed an immediate threat. Specifically, she argues that when viewing the facts in the light most favorable to her, there are genuine disputes as to (1) whether Robinson ever had or pointed a firearm at Defendants; and (2) whether Robinson, even if in possession of a firearm, posed a threat to Defendants when they fired at him after he had fallen.

27

"At summary judgment, [the Court] cannot simply accept the officer[s'] subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party" to determine whether the use of force was excessive. *Fils*, 647 F.3d at 1288 (citing *Vinyard*, 311 F.3d at 1347–48). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (declining to adopt the nonmoving party's version of events where it was contradicted by video evidence); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (noting that a court need not permit a case to go to a jury when the inferences drawn from the evidence upon which the nonmovant relies are implausible).

The Court will resolve factual disputes in the record in Ms. Robinson's favor "when sufficient, competent evidence [is] present to support [her] version of the disputed facts." *Pace*, 283 F.3d at 1276; *see also Mize*, 93 F.3d at 742 (11th Cir. 1996) ("For factual issues to be

considered genuine, they must have a real basis in the record." (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993))). "[S]peculation is insufficient to overcome a summary judgment motion." *Garrison v. Sam's E., Inc.,* 787 F. App'x 627, 630 (11th Cir. 2019).

First, Ms. Robinson argues that there is a dispute of material fact as to whether Robinson ever had a weapon or pointed one at Defendants. She bases her assertion primarily on the fact that Robinson's fingerprints were not found on the recovered HiPoint .380 and that his ex-girlfriend never saw him with a weapon.[7]

These facts are insufficient to create a genuine dispute as to whether Robinson had a weapon. *See, e.g., Alvarado-Escobedo v. United States*, 817 F. App'x 536, 542 (10th Cir. 2020) (concluding that the plaintiffs failed to show a genuine factual issue concerning whether the suspect possessed a pistol or pointed one at the officer and noting that "direct evidence refutes the inference plaintiffs seek to draw from the

---

[7] Ms. Robinson cites only White's unsworn interview, which is hearsay. White was not deposed, nor did she provide a sworn declaration. Moreover, this purported fact was not included in Ms. Robinson's statement of additional material facts.

witnesses' previous failure to observe [the suspect] with a firearm");
*King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 986 (7th Cir. 2020)
(finding that the plaintiff could not make anything of the lack of latent
fingerprints because it was not "affirmative evidence that contradicts
the officers' testimony" and concluding that the plaintiff's version of
events does not rise above speculation or conjecture). Moreover, the
GBI's expert crime scene specialist testified that it is not uncommon to
not find fingerprints on a firearm.

In light of the direct evidence, no reasonable jury could conclude
that Robinson did not have a firearm or point or fire one toward
Defendants. Robinson was the subject of an active arrest warrant for
pointing a firearm at two APD officers. A HiPoint .380 was recovered
from the scene, and DNA evidence confirmed that Robinson's blood was
on the HiPoint. Ms. Robinson does not dispute that the GBI recovered
three spent .380 shell casings from the landing and stairs that were
each forensically determined to have been fired from the recovered
HiPoint. The investigation also uncovered two defects in the stairwell
wall that indicated that bullets were fired at a downward trajectory

30

from the stairs toward the apartment door, and two .380 bullets in the

upstairs front bedroom, above the front door.[8]

Three officers have stated that they saw Robinson with a firearm;

four officers recalled hearing the sounds of someone racking the slide of

a firearm; five officers heard the sounds of two muffled gunshots from

Robinson's direction; and witnesses heard the SERFTF team

instructing Robinson to drop his weapon.

Ms. Robinson's remaining arguments as to why Robinson was not

armed are irrelevant or directly contradicted by the record. She points

to the fact that the recovered HiPoint was reported stolen in 2013. This

has no bearing on whether Robinson possessed the firearm in 2016. She

also argues that an officer yelling "drop the gun" does not necessarily

mean someone is actually trying to aim at and shoot the officer.

---

[8] Ms. Robinson relies on the expert reports of Dr. Baden and Mr. Bedard in
support of her argument that her son did not fire a gun at Defendants. Dr. Baden's
opinion on this issue is outside the scope of his expertise in forensic pathology.
Regardless, their opinions that Robinson did not fire a gun toward Defendants, even
if admitted, would be insufficient to create a dispute of fact. Dr. Baden and Mr.
Bedard each based their opinion on the erroneous understanding that the two
HiPoint .380 bullets were recovered from the bedroom behind Robinson, not from
the front bedroom above the front door. In his deposition, Dr. Baden admitted that
if his understanding that two bullets were fired into the back bedroom is incorrect,
he would change his opinion.

However, the relevant inquiry is whether, at the time force was used, reasonable officers would have perceived Robinson to be an immediate threat. *See Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (finding use of force objectively reasonable "[r]egardless of whether [the suspect] had drawn his gun," where the suspect's gun was available for ready use).

Finally, Ms. Robinson contends that no bullets consistent with someone firing from upstairs toward downstairs were ever found and that the recovered firearm was inoperable. Each of these assertions is contradicted by direct evidence.

Ms. Robinson has not presented sufficient evidence favoring her version of events. Indeed, her theory is blatantly contradicted by the record and unable to "support reasonable inferences sufficient to create an issue of fact" as to whether Robinson had a weapon or pointed or fired one toward Defendants. *Riley v. City of Montgomery*, 104 F.3d 1247, 1251 (11th Cir. 1997) (noting that the plaintiff presented no evidence to contradict a defendant-officer's testimony and finding the plaintiff's theory of the incident to be "inherently incredible"); *see also*

*Polk v. Nugent*, 554 F. App'x 795, 797 (11th Cir. 2014) ("[I]nference[s] based on speculation and conjecture [are] not reasonable." (quoting *Ave. CLO Fund, Ltd. v. Bank of Am., NA*, 723 F.3d 1287, 1294 (11th Cir. 2013))).

Second, Ms. Robinson contends that there is a dispute of material fact as to whether the Defendants continued to use excessive force after Robinson no longer posed a threat. It is undisputed that during the encounter, Robinson fell onto the stairs with his torso on the landing and his legs coming down the stairs. It is also undisputed that his capacity decreased during the encounter and that at some point after falling he stopped moving and became unresponsive.

According to Defendants' version of events, they fired at Robinson while he was on the ground only when he leaned up as if to point his firearm at them. They also insist that no shots were fired at Robinson once he became unresponsive.

According to Ms. Robinson's version of events, Robinson was so incapacitated from injuries that he was physically unable to lift any firearm and point it down the stairs once he had fallen; despite his

incapacitation, Defendants continued to fire at him. Ms. Robinson also alleges that after the flashbang was deployed, when Robinson was indisputably unresponsive, a Defendant climbed the stairs, stood over her son's body, and fired two shots into him.

In support of her theory that Robinson was incapacitated once he fell, Ms. Robinson points out that several Defendants recall seeing Robinson struck by bullets prior to falling. She also cites to the forty-two bullets that were removed from Robinson's body, the seventy-six lacerations on his body as depicted in the autopsy photographs, and the fact that roughly one hundred bullets were fired during the incident as evidence of excessive force.

"A police officer is entitled to continue his use of force until a suspect thought to be armed is 'fully secured.'" *Jean-Baptiste*, 627 F.3d at 821–22 (quoting *Crenshaw*, 556 F.3d at 1293). Therefore, Ms. Robinson cannot show excessive force based on the number of bullets fired. *See Cooper v. Rutherford*, 503 F. App'x 672, 676 (11th Cir. 2012) ("[W]e cannot find a single case in this circuit or from the Supreme Court that clearly establishes that a large number of shots fired makes

a reasonable use of deadly force unreasonable."); *see also Graham*, 490 U.S. at 396–97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

Nor can Ms. Robinson rely on her son's injuries to create a dispute as to whether he posed a threat to officers while on the ground. Ms. Robinson cites the expert report of Dr. Small, an orthopedist, in support of her argument. As Ms. Robinson acknowledges, Dr. Small's testimony can establish only facts that are already undisputed: at some point, Robinson became incapable of upright ambulatory movement, and at some point, Robinson became seriously incapacitated. Because he does not know the sequence of Robinson's injuries, Dr. Small can only speculate as to *when* Robinson became non-ambulatory or incapacitated.[9] Such speculation, even if admitted, would be insufficient

---

[9] In his expert report, Dr. Small also opines that based on injuries to Robinson's hand, Robinson at some point became unable to handle and discharge a firearm. Because Dr. Small does not know when Robinson received these injuries,

to create a dispute of fact as to when Robinson no longer posed a threat.[10]

And again, the relevant question is not Robinson's actual capabilities, but whether a reasonable officer would have perceived Robinson to be a threat.

Ms. Robinson also relies on the bystander video to argue that Defendants used deadly force after Robinson was incapacitated. She points to the amount of gunfire that is heard in the video after Robinson falls to argue that a reasonable jury could conclude that an "overwhelming majority" of the gunfire occurred while Robinson was lying on the ground. [277] at 16.

However, the video does not show when Robinson fell, and due to a gap in the video where the apartment is out of view, it cannot even

---

he cannot testify as to when Robinson could no longer handle a firearm. Moreover, during his deposition, Dr. Small re-reviewed Robinson's x-rays and clarified that he could not rule out the possibility that Robinson did not at any point lose the ability to point a firearm.

[10] To the extent that Ms. Robinson relies on Bedard's expert opinion that Robinson's injuries rendered him "incapable of supporting weight" and made it "unlikely" that he could guide a firearm, these opinions are outside of Bedard's expertise in use of force and police tactics. [233-2] at 20. Even if admitted, the opinions would not be sufficient to create a dispute of fact as to *when* Robinson no longer posed a threat because Bedard considered only Robinson's "final form." *Id.*

36

show at what point Defendants entered the apartment. Ms. Robinson

uses the term "volley" (occasionally interchanged with "burst," and

"round") when describing the gunfire in the video in an effort to provide

a chronology and to argue that Robinson fell to the ground early in the

exchange, but the term is not defined in the record, nor is it used

consistently by Ms. Robinson, Defendants, or the expert witnesses.

Most importantly, the amount of gunfire that occurred after

Robinson fell is not relevant to the question of whether, at the time

Defendants fired, a reasonable officer would have perceived Robinson as

posing a danger. The inference that Ms. Robinson asks the Court to

draw regarding the amount of gunfire after Robinson fell is insufficient

to overcome Defendants' sworn testimony that they fired toward

Robinson only when he posed an immediate threat.

Finally, Ms. Robinson asks the Court to adopt her version of

events that after the flashbang was deployed, an unidentified

Defendant stood over Robinson's body while he was unresponsive and

fired two bullets into him. In her complaint, she alleges that this

occurred after Robinson died, which cannot support an excessive force

claim. *McQuarter v. City of Atlanta*, 572 F. Supp. 1401, 1419 (N.D. Ga. 1983) (stating, "it is clear that the civil rights of a person cannot be violated once that person is dead" in a § 1983 case). It is not clear to the Court whether Ms. Robinson now argues that this occurred before Robinson died. Nevertheless, the Court finds that Ms. Robinson has not presented plausible, sufficient evidence to support her version of events.

Ms. Robinson cites the sound heard in the bystander video after the flashbang is deployed as evidence that shots were fired after Robinson was unresponsive. *See Robinson v. Rankin*, 815 F. App'x 330, 339 (11th Cir. 2020) (grouping shots fired by the officer into sets of shots for purposes of the excessive force analysis and examining the reasonableness of each set).

All Defendants deny firing or hearing gunfire after the flashbang on the day of the incident, though they agree that the noise in the video sounds like a burst of gunfire. Even so, Defendants argue that a sound resembling gunfire is insufficient to create a genuine dispute as to whether Defendants' use of force was reasonable.

Defendants also contend that even if shots were fired after the flashbang, Ms. Robinson cannot show, even after the benefit of discovery, (1) that the shots were fired by a Defendant; or (2) that the shots struck and injured Robinson.

The Court finds that the unresolved noise in the obstructed bystander video alone is not sufficiently probative to create a genuine issue for trial as to whether Defendants used deadly force after Robinson became unresponsive. *See Liberty Lobby, Inc.*, 477 U.S. at 249–50 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)); *see also Cloud v. Stone*, Civil Action No. 3:18-1070, 2020 WL 401914, at *7 (W.D. La. Jan. 23, 2020) (finding the witness's video of the incident to be of limited value and unable to support the plaintiff's speculative theory of events where much of the video was obscured and it was not clear from the video whether the defendant-officer or the suspect fired the shots in question).

The remaining evidence upon which Ms. Robinson relies in support of her version of events is inadmissible, speculative, or self-contradictory, making any inference drawn therefrom highly implausible at best.

Ms. Robinson points to two bullets allegedly found in the second-floor landing floorboards. First, she has not proffered admissible evidence of these bullets, nor has she explained how the evidence would be reduced to an admissible form at trial. *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (allowing otherwise admissible evidence to be submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form).[11] Second, her expert witnesses in forensic pathology offer conflicting opinions regarding these alleged bullets.

Dr. Baden uses these bullets as evidence that Robinson was shot twice in the lower leg from above. Notably, this opinion is directly

---

[11] The bullets were purportedly recovered by a private investigator hired by Ms. Robinson. Ms. Robinson has not identified the investigator as a witness, nor has she produced any report from the investigator. At different times, Ms. Robinson cites the GBI Forensic Report dated January 13, 2017, the report dated June 16, 2017, and a GBI Investigative Summary as evidence of the bullets, but the Court cannot find mention in these reports of bullets found in the second-floor landing.

contradicted by the undisputed fact that when Robinson fell, his legs were positioned down the stairs. It is Dr. Crowns's opinion, on the other hand, that a bullet can come out of a body and lodge in the floorboards in any particular manner, and he admits that there is no evidence that any bullet in the floorboards traveled through Robinson at all. Tellingly, Ms. Robinson now admits that "whether or not there was a bullet found" in the landing floorboard "is irrelevant" to where the shooter was standing. [263] at 9.

Ms. Robinson also points to evidence that specific wounds in Robinson's body have downward trajectories, but Ms. Robinson's own experts disagree as to which wounds show a downward trajectory.[12] More importantly, Dr. Crowns stressed repeatedly that without dissection of the wound tracks, which the medical examiner did not

---

[12] Dr. Crowns speculates that a wound to Robinson's left thigh has a potentially downward trajectory. Dr. Baden opines that two wounds in Robinson's lower right leg are the wounds with a downward trajectory.

attempt in this case, any opinion as to wound trajectory is all speculative.[13]

Finally, Ms. Robinson points to gunshot residue found on Robinson's shirt as evidence that a firearm was discharged in close range to her son. However, the GBI firearms examiner did not run distance pattern tests on the shirt because residue on the shirt could have been residue from Robinson discharging his own weapon, from the body being moved down the stairs, or from the flashbang.[14]

Simply put, Ms. Robinson has not presented sufficient competent evidence to create a genuine factual issue such that the Court must credit her shifting theories of liability. *See, e.g.*, *Garrison*, 787 F. App'x at 630 (affirming the district court's grant of summary judgment where the plaintiff's theory of liability "[did] not rise above the level of speculation and guesswork"); *Riley*, 104 F.3d at 1251 (finding that

---

[13] Even if the wound trajectories were not speculative, Dr. Crowns acknowledges that a downward trajectory does not rule out the possibility that the shot was fired from below Robinson.

[14] When presented with the firearms examiner's testimony regarding the shirt, Dr. Crowns withdrew any opinion regarding the gunshot residue.

plaintiff's "inherently incredible" theory of the incident could not create an issue of fact where no reason existed to believe it).

Viewing the facts in the light most favorable to Ms. Robinson and drawing all reasonable inferences in her favor, the Court finds that Robinson posed an immediate threat of harm to Defendants when he pointed or fired his firearm toward them or attempted to do so.

"Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," use of deadly force does not violate the Constitution. *Garner*, 471 U.S. at 11 (noting that this is true even where an officer uses deadly force to prevent the suspect's escape); *see also Clark v. City of Atlanta*, 544 F. App'x 848, 856 (11th Cir. 2013) (stating that "to be entitled to qualified immunity, 'an officer need only have arguable probable cause' to employ deadly force (quoting *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002))); *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003) (finding that the Constitution "permit[s] the use of deadly force against a suspect who

poses not merely an escape risk (because he is not yet in police control), but also an imminent threat of danger to a police officer or others").

Moreover, a police officer is entitled to continue his use of deadly force until a suspect thought to be armed is fully secured. *Clark*, 544 F. App'x at 856 (quoting *Crenshaw*, 556 F.3d at 1293) (holding that the officer acted reasonably in continuing to shoot at the suspect until the threat of serious physical harm was eliminated and the suspect was secured); *Jean-Baptiste*, 627 F.3d at 822 ("Until Officer Gutierrez verified that Jean-Baptiste was disarmed, Officer Gutierrez 'had no reason to trust that [Jean-Baptiste] would not suddenly attempt to do him harm.'" (quoting *Crenshaw*, 556 F.3d at 1293)).

Defendants' encounter with Robinson was exactly the type of "tense, uncertain and rapidly evolving" crisis envisioned by the Supreme Court when articulating the reasonableness calculus. *Graham*, 490 U.S. at 397. Defendants repeatedly sought to arrest Robinson peacefully, but Robinson continually refused to comply and instead threatened Defendants with serious harm.

44

Considering the totality of the circumstances, the Court finds that Defendants' use of deadly force against Robinson was objectively reasonable. *See, e.g.*, *Hunter v. Leeds, City of*, 941 F.3d 1265, 1279 (11th Cir. 2019) (finding that the officer did not violate the suspect's constitutional rights by using deadly force where the officer had probable cause to believe that the suspect posed a threat of serious physical harm when he pointed his gun at the officer); *Clark*, 544 F. App'x at 856 (finding deadly force objectively reasonable under the circumstances once the suspect pulled out a gun); *Penley*, 605 F.3d at 851 (finding deadly force reasonable where the suspect refused to drop the weapon when repeatedly commanded to do so and instead pointed his weapon at the officers); *Garczynski*, 573 F.3d at 1168 (finding that the "escalation into deadly force was justified" when the suspect refused to comply with commands to show his hands and drop the firearm and instead swung the firearm in the direction of the officers); *Carr v. Tatangelo*, 338 F.3d 1259, 1273 (11th Cir. 2003) (finding use of deadly force reasonable where officers heard the chambering of a bullet and saw a suspect point a weapon at a fellow officer).

45

Having found no constitutional violation, the qualified immunity analysis ends. Accordingly, qualified immunity shields Heinze, Hutchens, and Doyle from Ms. Robinson's excessive force claim, and summary judgment is appropriate.

### 2.   Excessive Force Claim Against Kindred, Mauney, O'Hare, Sauls, and Schreckengost

A threshold element for any claim of excessive use of force is a showing that the plaintiff was seized by the "intentional acquisition of physical control by a government actor." *Vaugh v. Cox*, 343 F.3d 1323, 1328 (11th Cir. 2003).

It is undisputed that these Defendants did not discharge their weapons or otherwise use any direct force against Robinson. In her response to these Defendants' motion for summary judgment, Ms. Robinson acknowledges that they did not use excessive force. Instead, she argues that they are liable only under her *Bivens* conspiracy claim.

Accordingly, Ms. Robinson has failed to show that Kindred, Mauney, O'Hare, Sauls, or Schreckengost engaged in the alleged constitutional violation. As these Defendants are entitled to qualified

immunity on Ms. Robinson's excessive force claim, their motion for summary judgment on this claim will be granted.

### 3. *Bivens* Conspiracy Claim

Defendants contend that Ms. Robinson's conspiracy claim fails because Ms. Robinson (1) cannot demonstrate any underlying unconstitutional conduct, and (2) offers no evidence that Defendants formulated a single plan to deny Robinson his constitutional rights. They also emphasize that the Supreme Court has never recognized a *Bivens* claim for conspiracy, and they ask this Court to decline to do so now.

Ms. Robinson responds that her conspiracy claim is cognizable under *Bivens* because *Bivens* claims are similar to claims brought under 42 U.S.C. § 1983, and civil conspiracy is a cognizable claim under § 1983. *See Glover v. Eight Unknown D.E.A. Agents/Drug Task Force Agents From Birmingham, Ala. Task Force*, 225 F. App'x 781, 784 (11th Cir. 2007) ("Bivens actions are analogous to § 1983 actions, and we will generally apply § 1983 law to Bivens cases."); *Rowe v. City of Fort*

*Lauderdale*, 279 F.3d 1271, 1283 (11th Cir. 2002) (providing the elements of § 1983 conspiracy).

Though the Eleventh Circuit has recognized the existence of a *Bivens* conspiracy claim, *Fulwood v. Federal Bureau of Prisons*, 568 F. App'x 753, 755–56 (11th Cir. 2014) (per curiam), in 2017 the Supreme Court cautioned against expanding *Bivens* beyond the three circumstances in which the Supreme Court has acknowledged a *Bivens* remedy. *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) (emphasizing that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity" and clarifying that "*Bivens* will not be extended to a new context if there are "special factors counselling hesitation in the absence of affirmative action by Congress'" (quoting *Carlson v. Green*, 446 U.S. 14, 18 (1980))).

The Court need not reach the question of whether a *Bivens* conspiracy claim is cognizable, though in light of the Supreme Court's decision in *Ziglar*, it would find that no such claim exists. Even if this Court were to recognize the claim, Ms. Robinson would be unable to establish a conspiracy to violate Robinson's Fourth Amendment rights.

To prove *Bivens* conspiracy, Ms. Robinson must

48

> establish (1) the existence of an express or implied
> agreement among the defendant officers to deprive [her son]
> of his constitutional rights, and (2) an actual deprivation of
> those rights resulting from that agreement.

*Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991). As discussed,

Ms. Robinson has failed to show an underlying constitutional violation,

and therefore her conspiracy claim fails. Even assuming arguendo that

Ms. Robinson could show actual denial of one of Robinson's

constitutional rights, she cannot show that Defendants reached an

agreement to violate his rights. *See Fulwood*, 568 F. App'x at 756 ("It is

not enough to simply aver that a conspiracy existed. A plaintiff must

instead show that the parties reached an understanding to deny the

plaintiff his rights. The linchpin for conspiracy is agreement, which

presupposes communication." (internal citations omitted)).

   As evidence of an agreement among Defendants to violate her

son's right to be free from excessive force, Ms. Robinson points to the

following: (1) Defendants' decision to not alter the tactical plan based on

Robinson's mental health issues; (2) the fact that the officers assigned

to the first, second, third, and fourth positions carried a Glock .40 pistol,

an H&K MP5 9mm submachine gun, an H&K UMP .40 submachine

gun, and a rifle, respectively; and (3) the officers' decision to breach and enter the apartment instead of "contain." [278] at 13.

None of these assertions shows an agreement among Defendants to use excessive force.[15] Indeed, that the SERFTF team did not alter its tactics based on Robinson's mental health, that the officers were so armed, and that the tactical plan was to conduct a knock-and-announce followed by a breach-and-hold if necessary all demonstrate that the tactical plan was consistent with every other SERFTF warrant operation designed to obtain peaceful compliance. Moreover, Ms. Robinson has admitted that Defendants' knock-and-announce procedure was proper and consistent with law enforcement standards.

Defendants indisputably followed procedure that is successful in achieving peaceful compliance and surrender in nearly every case. Ms. Robinson has not shown that the tactical plan included any agreement

---

[15] To the extent that Ms. Robinson relies on Bedard's expert report in support of these allegations, "so long as 'a reasonable officer could have believed that his conduct was justified,' a plaintiff cannot 'avoi[d] summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless.'" *City & Cnty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1777 (2015) (quoting *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002), *abrogated on other grounds by Cnty. of L.A. v. Mendez*, 137 S. Ct. 1539, 1546 (2017)).

to violate Robinson's constitutional rights, and no reasonable jury could make such an inference. *See also Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007) (stressing the threat posed by the suspect's mentally unstable condition when finding the officer's use of force to be objectively reasonable).

Ms. Robinson also argues that Defendants lied and fabricated evidence after the incident to cover up their excessive use of force, which shows an agreement to violate civil rights. These assertions amount to nothing more than "mere speculation and conjecture" and are "an insufficient basis on which to predicate liability" *Puglise v. Cobb Cnty.*, 4 F. Supp. 2d 1172, 1181 (N.D. Ga. 1998) (finding that the plaintiffs' allegations in support of their §§ 1983 and 1985(2) conspiracy claim were merely speculative and noting that "minor discrepancies in officers' testimony about their locations when shots were fired" are more indicative of a lack of agreement than of conspiracy).[16]

---

[16] Ms. Robinson relies primarily on two cases to support her argument that a jury can infer conspiratorial agreement from a fabricated story after-the-fact: *Sanchez v. Foley*, 972 F.3d 1 (1st Cir. 2020), and *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015). However, the First Circuit clarified in *Sanchez* that evidence of a cover-up, without any evidence of a conspiratorial agreement prior to the alleged unlawful conduct, cannot support a claim for civil

Ms. Robinson's *Bivens* conspiracy claim is utterly unsupported by any evidence. Accordingly, summary judgment as to the claim will be granted.

### 4.   Tort Claims

Defendants contend that Ms. Robinson's state law tort claims for battery and wrongful death fail because, pursuant to the Federal Tort Claims Act ("FTCA"), a suit against the United States is the exclusive remedy for tort claims arising from the actions of federal employees taken within the scope of their employment. 28 U.S.C. § 2679(b)(1). Defendants Kindred, Mauney, O'Hare, Sauls, and Schreckengost argue in addition that Ms. Robinson has failed to produce evidence that supports either claim against them, as she has admitted that they exercised no force against Robinson.

Ms. Robinson responds that any decision on the state law claims would be premature because this Court limited discovery in this case "to

---

rights conspiracy. 972 F.3d at 12. Moreover, in *Weiland* the Eleventh Circuit held that the complaint sufficiently alleged civil rights conspiracy because the officers' alleged cover-up *caused* the specific deprivation of the plaintiff's constitutional rights by directly and proximately causing his unjust incarceration. 792 F.3d at 1327–28 (emphasis added).

determine who discharged their weapons, and who did not, and under what circumstances to help determine qualified immunity against *Bivens* violations for excessive force." [85] at 40.

The FTCA permits a tort suit against the United States if personal injury or death is "caused by the negligent or wrongful act or omission" of the government employee acting in the scope of his employment. 28 U.S.C. § 1346(b). Under 28 U.S.C. § 2671, "employee of the government" includes "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation . . . ." Under 5 U.S.C. § 3374(c), a local government employee on detail to a federal agency is deemed an employee of the agency for purposes of the FTCA. *Ellis v. Ficano*, No. 94-1039, 1995 WL 764127, at *6 (6th Cir. Dec. 27, 1995).

Generally, the Attorney General defends any civil action brought against an employee of the Government. *Id.* § 2679(c). The Attorney General then certifies that the defendant employee was acting within the scope of his employment "at the time of the incident out of which the

53

claim arose . . . ." *Id.* § 2679(d)(1). At that point, the civil action will be deemed an action against the United States, and the United States is substituted as a party defendant. *Id.* The Attorney General has delegated certification authority to the United States Attorneys under 28 C.F.R. §§ 15.3 and 15.4.

Accordingly, the U.S. Attorney for the Northern District of Georgia is directed to file with the Court the appropriate scope of employment certification and notice of substitution. Upon such filing, the action will be deemed an action against the United States pursuant to 28 U.S.C. § 2679(d)(1), and the Court will drop Sauls, Schreckengost, O'Hare, Hutchens, Mauney, Heinze, Kindred, and Doyle as Defendants and substitute for them the United States of America.

In light of today's ruling on the *Bivens* claims, Ms. Robinson will be given an additional ten days to respond as to why summary judgment should not be granted with respect to her battery and wrongful death claims.

## B.   *Daubert* Motions to Exclude

The Court need not reach Defendants' *Daubert* motions to exclude Ms. Robinson's expert witnesses. Even if the contested expert witness testimony were admitted, Ms. Robinson fails to create a genuine issue of material fact with respect to her excessive force and conspiracy claims.

## IV.   Conclusion

For the foregoing reasons, Defendants' motions [248, 249] for summary judgment are granted in part with respect to Ms. Robinson's *Bivens* claims for excessive force and conspiracy. Summary judgment with respect to the battery and wrongful death claims is withheld pending Ms. Robinson's response.

Defendants' motions [244, 245, 246, 247] to exclude Ms. Robinson's expert witnesses are denied as moot.

Ms. Robinson is directed to file a response within ten days addressing why summary judgment on her battery and wrongful death claims should not be granted.

IT IS SO ORDERED this 24th day of February, 2021.

Timothy C. Batten, Sr.
United States District Judge