[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-10719

_____

MONTERIA NAJUDA ROBINSON,
as the natural parent of Jamarion Rashad Robinson, and The of
Estate of Jamarion Rashad Robinson,

Plaintiff-Appellant,

*versus*

WILLIAM SAULS,
Atlanta Police Officer,
STEVE SCHRECKENGOST,
Atlanta Police Detective,
STEVE O'HARE,
Atlanta Police Detective,
KRISTOPHER HUTCHENS,
Clayton County Police Officer,
JOSHUA MAUNEY,

2                    Opinion of the Court                    23-10719

Fayette County Sheriff's Officer, et al.,

                                                    Defendants-Appellees,


DANIEL DOYLE, et al.,
Fulton County Detective,

                                                              Defendants.


—————————————————


                 Appeal from the United States District Court
                    for the Northern District of Georgia
                      D.C. Docket No. 1:18-cv-00131-TCB

—————————————————


Before JILL PRYOR, BRANCH, and HULL, Circuit Judges.

JILL PRYOR, Circuit Judge:

        This case arises out of the shooting death of Jamarion
Robinson (Mr. Robinson). The shooting occurred when deputy
United States Marshals and local police officers from departments
across the Atlanta area—working together on a task force overseen
by the United States Marshals Service (USMS) to apprehend
fugitives—attempted to arrest Mr. Robinson on two outstanding
state warrants. When officers went to arrest him at his girlfriend's
apartment, a shootout ensued, and he was killed.

The issue in this appeal is whether his mother, Monteria Robinson (Ms. Robinson), may bring an excessive-force claim for money damages arising under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), against two of the task force members. To answer this question, we look to the Supreme Court's recent decision in *Egbert v. Boule*, 596 U.S. 482 (2022). After carefully considering *Egbert*, and with the benefit of oral argument, we conclude that no *Bivens* cause of action is available here. We thus affirm the district court's judgment.

## I.  BACKGROUND

In a previous opinion, we recounted in detail the facts giving rise to Ms. Robinson's excessive-force claim. *See Robinson v. Sauls (Robinson I)*, 46 F.4th 1332, 1336–39 (11th Cir. 2022). We refer to that decision for the relevant facts about the shooting that occurred when members of the Southeast Regional Fugitive Joint Task Force went to arrest Mr. Robinson.

Ms. Robinson sued several individuals and entities whose actions she believed caused her son's death. The defendants included deputy United States Marshal Eric Heinze, Clayton County police officer Kristopher Hutchens, and Fulton County police officer Daniel Doyle.[1] The second amended complaint asserted, among other claims not relevant here, a claim under 42 U.S.C. § 1983 and one under *Bivens*, both alleging that the

---

[1] While this litigation was pending, Officer Doyle died. The district court substituted the administrator of Officer Doyle's estate as a defendant. For ease of reference, we call this defendant "Doyle."

officers violated Mr. Robinson's constitutional rights by using excessive force.

At the pleading stage, the district court dismissed the § 1983 claim. It explained that § 1983 provided a cause of action for a plaintiff who was "deprived of a federal right by a person acting under color of state law." Doc. 85 at 16 (internal quotation marks omitted).[2] Because the officers were acting as part of a federal task force, the court concluded they were acting "under color of federal and not state law" and could not be held liable under § 1983. *Id.* at 16–17.

Ms. Robinson then filed a third amended complaint. In this pleading, she again asserted an excessive-force claim under *Bivens* against Officers Heinze, Hutchens, and Doyle, among others.[3] After the parties completed discovery, the district court granted summary judgment to the officers, concluding that they were entitled to qualified immunity because their use of force was not unreasonable under the circumstances.

Ms. Robinson appealed, challenging only the district court's order granting summary judgment on her *Bivens* claim. She did not challenge the district court's earlier order dismissing her § 1983 claim.

---

[2] "Doc." numbers refer to the district court's docket entries.

[3] In the third amended complaint, she did not assert a § 1983 claim against the officers.

We affirmed in part and reversed in part. *See Robinson I*, 46 F.4th at 1335–36. We explained that the evidence, when viewed in the light most favorable to Ms. Robinson, showed that when the officers went to arrest Mr. Robinson a shootout ensued and Officers Doyle and Heinze continued to shoot Mr. Robinson after seeing that he was unresponsive and had lost consciousness. *Id.* at 1337–38, 1342–44.[4] We reversed the grant of summary judgment to Officers Doyle and Heinze, concluding that they were not entitled to qualified immunity on Ms. Robinson's claim that they used excessive force when they continued to shoot after Mr.

---

[4] The first opinion acknowledged that a genuine dispute of material fact existed as to whether the shooting stopped or continued after Mr. Robinson was unresponsive. *Robinson I*, 46 F.4th at 1335–36. After the shootout, "Officer Hutchens thew a flashbang device behind Mr. Robinson" to "test whether Mr. Robinson remained a danger." *Id.* at 1337. "The device exploded, but Mr. Robinson did not react." *Id.* Officers Heinze and Hutchens maintained that "no member of the Task Force team fired a weapon after the flashbang exploded." *Id.*

But in a video recorded by a bystander from a nearby apartment, "[a]bout 20 seconds after the flashbang exploded, there [is audio of] another burst of gunfire." *Id.* at 1338. A task force team member who reviewed the bystander video testified that the subsequent gunfire-burst sound (1) "was consistent with the noise produced by Officer Doyle's" weapon and (2) also could have been produced by Officer Heinze's weapon "if Officer Heinze fired 'in the right sequence' alongside someone else who was shooting." *Id.* We concluded that this evidence, when viewed in the light most favorable to Ms. Robinson, "created a genuine issue of material fact concerning whether Officer Doyle individually or Officers Doyle and Heinze together shot Mr. Robinson after the flashbang exploded." *Id.* at 1343.

Robinson was confirmed to be unconscious. *Id.* at 1342–46. We otherwise affirmed the district court's grant of summary judgment.

While Ms. Robinson's initial appeal was pending, the Supreme Court issued its *Egbert* decision. When the case returned to the district court, Officers Heinze and Doyle moved for judgment on the pleadings, arguing based on *Egbert* that the excessive-force claim against them was not "cognizable under *Bivens.*" Doc. 330 at 4–5. The district court granted their motion.

This is Ms. Robinson's appeal.

## II.      STANDARD OF REVIEW

We review *de novo* a district court's decision to dismiss a *Bivens* claim. *Lee v. Hughes*, 145 F.3d 1272, 1274 (11th Cir. 1998).

## III.     DISCUSSION

The issue in this appeal is whether a judicially crafted *Bivens* cause of action is available for the claim alleging that Officers Heinze and Doyle used excessive force in violation of Mr. Robinson's Fourth Amendment rights.[5] We agree with the district

---

[5] On appeal, Ms. Robinson also argues that the district court erred when it concluded that the local law enforcement officers were not acting under color of state law when they participated in the joint task force and thus dismissed her § 1983 claim against them. The district court dismissed the § 1983 claim early in the case, well before the appeal in *Robinson I*. When Ms. Robinson appealed in *Robinson I*, she could have challenged the dismissal of the § 1983 claim but did not. Instead, she challenged only the grant of summary judgment on her *Bivens* claim for excessive force. Given this procedural history, Ms. Robinson is barred under the law-of-the-case doctrine from

court that no *Bivens* cause of action is available here. To explain why, we first outline the framework we use to review when a *Bivens* cause of action is available. We then apply this framework to conclude that Ms. Robinson has no cause of action.

## A.      The *Bivens* Framework

In *Bivens*, the Supreme Court recognized a private right of action under the Fourth Amendment for damages against agents of the Federal Bureau of Narcotics who allegedly manacled the plaintiff and threatened his family while searching his home and arresting him for narcotics violations. 403 U.S. at 389. In his complaint, the plaintiff sought damages for his claims that the agents violated his Fourth Amendment rights when they performed a warrantless search, arrested him without probable

---

challenging the dismissal of the § 1983 claim in this appeal. *See United States v. Escobar-Urrego*, 110 F.3d 1556, 1560 (11th Cir. 1997) (explaining that "a legal decision made at one stage of the litigation, unchallenged in a subsequent appeal when the opportunity existed, becomes the law of the case," meaning the "parties are deemed to have waived the right to challenge that decision at a later time").

Ms. Robinson attempts to get around the law-of-the-case bar by arguing that "newly discovered evidence" shows that the local law officers were acting under color of state law when they participated in the task force. Appellant's Br. 5. It is true that there is an exception to the law-of-the-case doctrine for newly discovered evidence. *Escobar-Urrego*, 110 F.3d at 1561. But the evidence to which Ms. Robinson points is not new; she had it when *Robinson I* was appealed. The record reflects that in November 2019 she filed the same evidence with the district court for another purpose. Because the appeal in *Robinson I* was not brought until 2021, she could have raised her challenge regarding the dismissal of the § 1983 claim in the earlier appeal.

cause or a warrant, and used "unreasonable force . . . in making the arrest." *Id.* at 389–90. "Although the Fourth Amendment does not in so many words provide for its enforcement by an award of money damages," in *Bivens* "the Court held that it could authorize a remedy under general principles of federal jurisdiction." *Egbert*, 596 U.S. at 490 (internal quotation marks omitted); *see also Bivens*, 403 U.S. at 392, 396. After *Bivens*, the Supreme Court recognized two other causes of action for damages for constitutional violations: for a former congressional staffer's sex-discrimination claim under the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228, 245–49 (1979), and for a federal prisoner's inadequate-care claim under the Eighth Amendment, *Carlson v. Green*, 446 U.S. 14, 16, 18–20 (1980). *Egbert*, 596 U.S. at 490–91.

Since these three cases, however, the Supreme Court has repeatedly refused to extend *Bivens* and has not recognized any other implied causes of action under the Constitution. *Ziglar v. Abassi*, 582 U.S. 120, 132, 135 (2017). It has warned that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity" because it impinges on "separation-of-powers principles." *Id.* at 135.

The Court considered whether to recognize a *Bivens* cause of action in *Egbert*. The plaintiff in that case, Robert Boule, operated a bed-and-breakfast and worked as a confidential informant for the United States Border Patrol. 596 U.S. at 487. He alleged that a border patrol agent violated the Fourth Amendment by using excessive force when searching his property. *Id.* at 489–90.

The Supreme Court considered whether there was an implied cause of action for damages against the border patrol agent for this alleged constitutional violation. *Id.* at 492–94. The Court traced the history of its cases addressing when a *Bivens* cause of action is available. *See id.* at 490–91. It acknowledged that it had not "dispense[d] with *Bivens* altogether." *Id.* at 491. But given the "tension between judicially created causes of action and the Constitution's separation of legislative and judicial power," it warned that courts must use "caution" when deciding whether "to imply a *Bivens* action." *Id.* (internal quotation marks omitted). Before recognizing an implied right of action for damages, a court "must evaluate a range of policy considerations," including "economic and governmental concerns, administrative costs, and the impact on governmental operations systemwide." *Id.* (internal quotation marks omitted). "If there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy," a court "must refrain from creating it." *Id.* (alterations adopted) (internal quotation marks omitted).

Following these observations, the Court recited its well-established two-part test for deciding whether to recognize a cause of action under *Bivens*. *Id.* at 492. First, a court must ask "whether the case presents a new *Bivens* context—*i.e.*, is it meaningfully different from the three cases in which the Court has implied a damages action." *Id.* (alteration adopted) (internal quotation marks omitted). The Court observed that "a new context arises when there are potential special factors that previous *Bivens* cases did not consider." *Id.* (internal quotation marks omitted). It gave as an

example of a new context when a case "involve[d] a new category of defendants," observing that in this situation "a court [was] not undoubtedly better positioned than Congress to create a damages action." *Id.* (internal quotation marks omitted). If the case presents a new context, a court must consider, second, whether "there are special factors indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Id.* (internal quotation marks omitted). "If there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy." *Id.* (internal quotation marks omitted).

The Supreme Court observed that these two steps "often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* When such a reason exists, a court may not expand *Bivens*. *See id.*

Significantly, "a court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure." *Id.* at 493 (internal quotation marks omitted). When such an alternative remedial scheme is in place, no cause of action for damages is available even when "existing remedies do not provide complete relief." *Id.* (internal quotation marks omitted). The Court reasoned that when alternative remedial structures are available, the Judiciary is not "better equipped" than the "political branches" to decide "whether

existing remedies should be augmented by the creation of a new judicial remedy." *Id.* (internal quotation marks omitted).

The Court then turned to whether a *Bivens* cause of action was available to Boule. It framed the inquiry as "whether a court is competent to authorize a damages action . . . against Border Patrol agents generally" and concluded that no cause of action was available. *Id.* at 496. It gave two "independent reasons" for this conclusion: (1) Congress was "better positioned to create remedies in the border-security context," and (2) the government "already has provided alternative remedies that protect plaintiffs like Boule." *Id.* at 494.

In concluding that Congress was better positioned to create a damages cause of action, the Court began with the premise that Boule's claim arose in the "border-security" area and thus presented a new context. *Id.* at 494–95. Special factors counseled hesitation before recognizing a cause of action in the border-security context because allowing an action against a border patrol agent implicated sensitive matters of foreign policy and national security, which were "rarely proper subjects for judicial intervention." *Id.* (internal quotation marks omitted).

The Court acknowledged that Boule's complaint included allegations of excessive force by a federal officer that were similar to the allegations against the federal agents in *Bivens*. *Id.* at 495. But the Court rejected the argument that the fact that Boule was bringing a "conventional excessive-force claim" in the "sphere of law enforcement" meant that a *Bivens* cause of action was available.

*Id.* (internal quotation marks omitted). The Court concluded that there were only "superficial similarities" with *Bivens*, which were "not enough to support the judicial creation of a cause of action." *Id.*

The Court gave an alternative reason for concluding that there was no cause of action under *Bivens*: Congress had already "provided alternative remedies for aggrieved parties in Boule's position." *Id.* at 497. The Court explained that a grievance procedure was available and that Boule had, in fact, taken advantage of this procedure, which prompted an internal investigation into the agent's conduct. *Id.* Although Boule could not participate in this grievance procedure and had no right to judicial review of any decision issued through the procedure, the Court nevertheless concluded that there was an alternative remedial scheme. *See id.* at 497–98 (explaining that an alternative remedial scheme did not need to "afford rights to participation or appeal"). It emphasized that *Bivens* was concerned with deterring individual federal officers from committing unconstitutional acts. *Id.* at 498. Because the grievance process was "sufficient to secure an adequate level of deterrence," the Court held that Boule was "afforded . . . an alternative remedy," which foreclosed a *Bivens* action. *Id.*

## B.   Application of the *Bivens* Framework

We now consider whether Ms. Robinson has a cause of action under *Bivens* for the claim that Officers Doyle and Heinze used excessive force when they continued to shoot Mr. Robinson

after he was unconscious and unresponsive. *Egbert* compels us to conclude that no cause of action is available, for two independent reasons. First, Congress is better positioned than the Judiciary to determine whether a cause of action is available in the new context of the USMS operating a joint state and federal task force to apprehend fugitives, particularly given that Congress has legislated in this area and has created no damages remedy. Second, the fact that Congress and the Executive Branch have created alternative procedures to review a claim that a task force member used excessive force forecloses a *Bivens* action here.

First, no *Bivens* remedy is available because Ms. Robinson's excessive-force claim arises in a new context—the USMS operating a joint state and federal task force to execute arrest warrants, and special factors counsel hesitation before recognizing a cause of action in this context. This case presents a new context because the Supreme Court has never recognized a cause of action for excessive force against officers operating as part of a USMS joint federal and state task force apprehending fugitives. Notably, in *Egbert*, the Supreme Court recognized that a case presents a new context when it involves a "new category of defendants." 596 U.S. at 492 (internal quotation marks omitted).

Officers participating in a USMS joint task force are a new category of defendants. We reach this conclusion after considering the statutory authority under which the USMS operates, particularly when it directs a joint state and federal task force organized to arrest fugitives.

The USMS traces its origins to the founding of the nation. As the Supreme Court has explained, "just one year after the ratification of the Fourth Amendment, Congress vested federal marshals with 'the same powers in executing the laws of the United States, as sheriffs and their deputies in the several states have by law, in executing the laws of their respective states.'" *Atwater v. City of Lago Vista*, 532 U.S. 318, 339 (2001) (quoting Act of May 2, 1792, ch. 28, § 9, 1 Stat. 265). Congress has continued to authorize "United States marshals [and] deputy marshals," when "executing the laws of the United States within a State," to "exercise the same powers which a sheriff of the State may exercise in executing the law thereof." 28 U.S.C. § 564.

Congress has carved out several roles for the USMS. Its "primary role and mission" is to "provide for the security" of and to "execute[] and enforce all orders of the United States District Courts [and] the United States Courts of Appeals." *Id.* § 566(a). It thus is responsible for "provid[ing] for the personal protection of Federal jurists, court officers, [and] witnesses." *Id.* § 566(e)(1)(A).

Along with these responsibilities, Congress has assigned the USMS responsibility for investigating "fugitive matters . . . as directed by the Attorney General." *Id.* § 566(e)(1)(B). Since at least the 1980s, Congress has authorized the USMS to participate in capturing fugitives. *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690 § 7608, 102 Stat. 4181, 4514. The USMS has regularly operated and participated in joint task forces with state and local law enforcement officers to arrest fugitives wanted on state or

federal charges. *See* Authority of FBI Agents, Serving as Special
Deputy United States Marshals, to Pursue Non-Federal Fugitives,
19 U.S. Op. O.L.C. 33, 34 (1995) (recounting history of USMS's
participation in these joint task forces). In 2000, Congress
mandated that the USMS establish permanent regional task forces
to apprehend fugitives. Presidential Threat Protection Act of 2000,
Pub. L. No. 106-544, 114 Stat. 2715, 2718–19; 34 U.S.C. § 41503(a)
(providing for the establishment of "permanent Fugitive
Apprehension Task Forces consisting of Federal, State, and local
law enforcement authorities in designated regions of the United
States, to be directed and coordinated by the United States
Marshals Service, for the purpose of locating and apprehending
fugitives," including state fugitives). When state and local law
enforcement officers participate in these task forces, they are
deputized and perform the functions of deputy marshals. *See*
28 C.F.R. § 0.112(b).

     Given the distinct statutory scheme within which both state
and federal officers operate when they participate in a USMS joint
task force apprehending fugitives, we conclude that claims against
such officers present a new context for *Bivens* purposes.[6]

---

[6] Officers Heinze and Doyle raise other arguments about why Ms. Robinson's
excessive-force claim arises in a new context. They point out that they entered
the apartment pursuant to a warrant, but the officers in *Bivens* were not acting
pursuant to a warrant. They also point out that the excessive-force claim here
arises out of a "gunfight between officers and a fugitive," which was "wholly
unlike the facts of *Bivens*." Appellees' Br. 34 (internal quotation marks

We cannot say that the Judiciary is undoubtedly in a better position than Congress to authorize a damages remedy in this context. Recognizing a cause of action for money damages against a task force member could impact cooperation among law enforcement agencies and the operation of these task forces. *See* 34 U.S.C. § 41503(a). Allowing claims for damages against task force members could chill recruitment for the task forces, which could negatively affect their operations in apprehending fugitives at both the state and federal level. *See Egbert*, 596 U.S. at 499 ("Recognizing any new *Bivens* action entails substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." (alteration adopted) (internal quotation marks omitted)).

We acknowledge that there are some similarities between this case and *Bivens*. Certainly, it is true that both this case and *Bivens* involved a claim that federal law enforcement officers used excessive force when making an arrest. But *Egbert* makes clear that even when this type of "superficial similarit[y]" is present, a case nonetheless may arise in a new context. 596 U.S. at 495. Because of the unique circumstances present when the USMS operates joint task forces to apprehend state and federal fugitives, including "the impact of potential liability on cooperation among law-enforcement agencies," we conclude "'that the Judiciary is not

---

omitted). Because we conclude that this case arises in a new context for the reasons given above, we need not address these other arguments.

undoubtedly better positioned than Congress to authorize a damages action.'" *Logsdon v. U.S. Marshal Serv.*, 91 F.4th 1352, 1358–59 (10th Cir. 2024) (quoting *Egbert*, 596 U.S. at 495).

In addition, although Congress has more than once enacted legislation governing these fugitive-apprehension task forces, *see* 34 U.S.C. §§ 20989, 41503(a), it has created no private right of action against task force members who commit constitutional violations. This congressional silence further counsels against creating a *Bivens* cause of action for money damages in this context. *See Abbasi*, 582 U.S. at 143–44 ("[I]n any inquiry respecting the likely or probable intent of Congress, the silence of Congress is relevant.").[7]

Bolstering our conclusion that there is no *Bivens* cause of action here is the existence of alternative processes and remedies in place to deter unconstitutional acts by task force members. Congress and the Executive branch have created at least two administrative procedures to review complaints of excessive force arising out of USMS-led task force actions.

The first administrative procedure available for review of excessive-force complaints is the USMS's internal grievance procedure. The USMS director is obligated by statute to "supervise

---

[7] Notably, by the time Congress enacted the statutes addressing USMS fugitive task forces, the Supreme Court had given notice that it was not inclined to expand *Bivens* to new contexts. *See Abassi*, 582 U.S. at 135 (laying out history of Supreme Court's *Bivens* decisions). Given this timing, Congress's "failure to provide a damages remedy" suggests "more than mere oversight." *Id*. at 143.

and direct the [USMS]." 28 U.S.C. § 561(g). And, by regulation, the director must investigate "alleged improper conduct on the part of [USMS] personnel." 28 C.F.R. § 0.111(n). The USMS thus has implemented a procedure for reviewing grievances alleging improper action by any task force member, whether a USMS employee or a local or state officer deputized to participate in the task force. *See* Off. of Pro. Resp., Internal Affs., *Misconduct Investigations Policy Directive 2.3*, U.S. Marshals Serv. 1 (Oct. 7, 2020), https://www.usmarshals.gov/sites/default/files/media/docume nt/usms-policy-directive-misconduct-investigations.pdf [https://perma.cc/Q3QN-RPRL]. Importantly, any aggrieved individual may submit a grievance by filling out an online form. *See Complaint Regarding United States Marshals Service (USMS) Personnel or Programs*, U.S. Marshals Serv., https://www.usmarshals.gov/sites/default/files/media/docume nt/complaint-form.pdf [https://perma.cc/E6VM-ZNXU]. Under the USMS's procedure, any "[i]ntentional, reckless or negligent violation of rules governing searches and seizures" may be punished with penalties ranging from reprimand to removal of the officer. *See Table of Disciplinary Offenses and Penalties*, U.S. Marshals Serv. 6, https://www.usmarshals.gov/sites/default/files/media/docume nt/united-states-marshals-guidance-table-of-disciplinary-offenses-and-penalties.pdf [https://perma.cc/48RT-429H].

The second administrative procedure available to an excessive-force aggrieved party is to file a complaint with the Department of Justice's Office of Inspector General (OIG). The

USMS is a bureau within the Department of Justice. 28 U.S.C.
§ 561(a). The Department's OIG is authorized to "investigate
allegations of criminal wrongdoing or administrative misconduct
by an employee of the Department of Justice." 5 U.S.C. § 413(b)(2).
Any person can report misconduct "related to" the USMS by
submitting an online complaint form to the OIG. Off. of the
Inspector Gen., *Submitting a Complaint*, U.S. Dep't of Just.,
https://oig.justice.gov/hotline/submit_complaint
[https://perma.cc/GPN7-9B7V]. "OIG investigations sometimes
lead to criminal prosecution or civil or administrative action."
*Logsdon*, 91 F.4th at 1360 (internal quotation marks omitted). If the
OIG decides not to investigate an allegation, "it may refer the
complaint to the internal-affairs office of the relevant [Department
of Justice] component (here, the USMS)." *Id.*

These administrative procedures serve to deter misconduct
by officers participating in USMS task forces. Because these
administrative procedures are sufficient to "secure[] adequate
deterrence," we conclude that they foreclose a *Bivens* action here.
*Egbert*, 596 U.S. at 497–98; *see also Logsdon*, 91 F.4th at 1359–61
(declining to recognize a *Bivens* cause of action against officers
participating in USMS joint task force because of USMS's and OIG's
grievance procedures).

Ms. Robinson does not dispute that these alternative
procedures are available. She argues instead that they are
inadequate because they are not "equally effective" as a cause of
action for damages under *Bivens*. Appellant's Br. 17–18 (internal

quotation marks omitted). But the Court in *Egbert* rejected this argument. It held that alternative administrative procedures foreclosed a *Bivens* cause of action even though they were "not as effective as an individual damages remedy." 596 U.S. at 497–98 (internal quotation marks omitted).

After considering *Egbert*, we decline to create an implied cause of action against task force members for use of excessive force. Given the possibility that recognizing a damages remedy could complicate the operation of joint task forces, Congress's failure to create an express damages remedy in this context, and the availability of other administrative procedures that deter officer misconduct, we conclude that there "are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy" here. *Id.* at 491 (internal quotation marks omitted). We must therefore "refrain from creating" a cause of action for the officers' alleged constitutional violations. *Id.* (internal quotation marks omitted).

## IV.    CONCLUSION

For the above reasons, we affirm the district court.

**AFFIRMED.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

June 04, 2024

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  23-10719-JJ
Case Style:  Monteria Robinson v. William Sauls, et al
District Court Docket No:  1:18-cv-00131-TCB

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered
today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP
41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing is governed by 11th Cir. R. 40-3, and the time
for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise
provided by FRAP 25(a) for inmate filings, a petition for rehearing is timely only if received in
the clerk's office within the time specified in the rules. **A petition for rehearing must include
a Certificate of Interested Persons and a copy of the opinion sought to be reheard.** See 11th
Cir. R. 35-5(k) and 40-1.

Costs
Costs are taxed against Appellant(s) / Petitioner(s).

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the
Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39
and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any
objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming
compensation via the eVoucher system no later than 45 days after issuance of the mandate or
the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or

cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Clerk's Office Phone Numbers
| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

OPIN-1 Ntc of Issuance of Opinion